UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>MAHABUBUZ ZAMAN,<br>    a/k/a "Faisal Ahmed,"<br>    a/k/a "Zaman Mahabub,"<br><br>DEFENDANT. | S4 13 Cr. 908 (AJN) |

**SENTENCING MEMORANDUM**

Law Office of Zachary Margulis-Ohnuma
260 Madison Avenue, 17th Fl.
New York, NY
(212) 685-0999
zach@zmolaw.com

*Attorneys for Defendant Mahabubuz Zaman*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

FACTS .................................................................................................... 3

I.  THE HISTORY AND CHARACTERISTICS OF THE OFFENDER . 8

   A.  Mr. Zaman's Early Childhood and Family ...................................... 8

   B.  Mr. Zaman's Immigration to the United States ............................ 12

   C.  Making a Living in a New Country ............................................. 13

   D.  Mr. Zaman's Family in the United States .................................... 17

   E.  Mr. Zaman's Leadership in the Bengali Community of Jamaica,
       Queens ..................................................................................... 21

   F.  The Consequences of Mr. Zaman's Conviction ........................... 29

II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ...... 30

   A.  The Offense Conduct ................................................................ 30

   B.  The Presentence Investigation Report and Sentencing Guidelines
       Calculation .............................................................................. 32

ARGUMENT ........................................................................................ 34

I.  THE GUIDELINES SENTENCE WITHOUT DEPARTURES IS 46
    TO 57 MONTHS IN PRISON [LEVEL 23, CHC I] ......................... 35

   A.  The Relevant Conduct Inquiry under the United States Sentencing
       Guidelines ............................................................................... 35

   B.  The Reasonably Foreseeable Intended Loss for the Criminal
       Activity Mr. Zaman Agreed to is Less than $400,000 ................. 38

   C.  Mr. Zaman Was Not an Organizer or Manager of the Fraud
       Scheme .................................................................................... 44

   D.  Mr. Zaman Played a Minor Role in the Offense ........................... 52

   E.  Mr. Zaman's Total Offense Level is 23 ....................................... 56

II. IF THE COURT AGREES WITH THE GOVERNMENT'S LOSS
    CALCULATION, IT SHOULD DOWNWARDLY DEPART
    BECAUSE THAT LOSS AMOUNT SUBSTANTIALLY
    OVERSTATES THE EXTENT OF MR. ZAMAN'S CONDUCT .... 56

III. THE COURT SHOULD IMPOSE A BELOW-GUIDELINES
SENTENCE BASED ON MR. ZAMAN'S PERSONAL HISTORY
AND CHARACTERISTICS AND TO AVOID UNWARRANTED
SENTENCING DISPARITIES........................................................... 58

   A.   A Sentence Near Those Imposed on Mr. Zaman's Co-Defendants
in this Case Would Prevent Unwarranted Disparities.................. 58

   B.   The Court Should Reduce Mr. Zaman's Sentence Because of the
Extreme Hardship to His Family .................................................. 64

   C.   A Reduced Sentence is Warranted Because Mr. Zaman Faces
Harsher Conditions of Confinement than Other Offenders Due to
His Immigration Status ................................................................. 69

CONCLUSION ............................................................................................. 74



**"This is the first birthday he was away from his daughters since birth, I asked them what they wanted for their birthday they replied 'We want our Papa.'"**

**– Monir Zaman**

## <u>INTRODUCTION</u>

Mahabubuz Zaman, known as Faisal, faces sentencing after a two-week trial revealed that he went into business with and assisted the leaders of a sophisticated scheme that defrauded banks by cashing counterfeit checks. At trial the government presented detailed, corroborated evidence about the nature of the scheme. But the government presented only scant evidence of Mr. Zaman's participation: even viewed in a light favorable to the government, the trial evidence showed he did little more than hang around the leaders of the fraud and introduce them to two or three clients who had been recruited by others. *See* Argument §§ I.C – I.D *infra*.

1

The evidence also showed that Mr. Zaman owned and operated a restaurant with the two main leaders of the fraud. The accompanying letters show that Mr. Zaman is in fact a well-known and beloved figure among Bengali immigrants in Jamaica, Queens. But the government has confused his role as a leader in the community—as a businessman, employer, mentor, coach, father, husband and friend—with his role in the fraud.

At bottom, we ask the Court to sentence Mr. Zaman based on the nature of his proven participation in the conspiracy, which was minor, and to take into consideration his life history and characteristics pursuant to 18 U.S.C § 3553(a). We also ask that the Court resist the government's urging to punish him excessively for exercising his right to go to trial. In particular, the Court should reject the government's position with regard to loss, which attributes vastly more losses to Mr. Zaman than it did to his co-conspirators, even though his participation was equivalent to theirs or less.

We submit that, properly calculated, Mr. Zaman's Guidelines sentence is no more than 46 to 57 months. *See* Argument I, *infra*. Mr. Zaman has demonstrated time and again that he is a generous, hard-working father, husband, employer and community leader. *See* Argument II.C, *infra*. His family and employees are already suffering extreme hardship from his absence and impending deportation. Accordingly, we request a non-

Guidelines sentence in line with those imposed on his seven co-defendants so far sentenced by this Court, which range from time-served to fifteen months imprisonment. *See* Argument II.B, *infra*. These points are discussed in further detail below.

## FACTS

This factual account is drawn from the trial transcripts and exhibits, materials received in discovery, letters from Mr. Zaman's family and friends, other materials provided by Mr. Zaman, the Presentence Investigation Report (the "PSR"), interviews with Mr. Zaman, interviews with Mr. Zaman's family, and our own investigation. The following is a list of exhibits, including letters written on behalf of Mr. Zaman and other materials documenting his personal history:

| Exhibit | Type | Source | Date |
|---|---|---|---|
| 1 | Affidavit | Affidavit of Joel Sickler, Prison Consultant | 2/10/15 |
| 2 | C.V. | *Curriculum vitae* of Joel Sickler | n/a |
| 3 | Article | William Selway & Margaret Newkirk, *Full by Law*, Bloomberg Business Week, Sept. 30, 2013 | 9/30/13 |
| 4 | Trial Exhibit | Government Trial Exhibit GX 1703 | n/a |
| 5 | Document | United States Sentencing Commission Proposed Amendments to the Sentencing Guidelines | 1/16/2015 |
| 6 | Transcript | Trial Transcript Excerpts | 10/29/2014-11/10/2014 |
| 7 | Letter | Abdul Mohsen Lodi, Friend | 1/7/15 |

| 8 | Letter | Ahsan Habib, Brother-in-Law | 12/1/15 |
|---|---|---|---|
| 9 | Letter | Ali Khan, Friend | 1/21/15 |
| 10 | Letter | Alla Uddin, Actel Wireless Supervisor | 1/10/15 |
| 11 | Letter | Altamas Syed, Friend | 1/3/15 |
| 12 | Letter | Anjum Naved, Tikka Garden Food Supplier | 12/27/14 |
| 13 | Letter | Anwarul Haque Sujan, Friend, Jamaica Youth Club member | 1/12/15 |
| 14 | Letter | Azmol Haque Chowdhury, Friend, Spouse of Kohinoor Begum | 1/24/15 |
| 15 | Letter | Childfund International, Child Sponsorship Organization | 2/5/15 |
| 16 | Pamphlet | Childfund International, Childfund Sponsor Pamphlet | n/a |
| 17 | Letter | ███ Ali, Nephew | 12/24/14 |
| 18 | Letter | Farhana Wahab, Friend | 11/19/14 |
| 19 | Letter | Faria Kabir, Niece | 12/3/14 |
| 20 | Letter | Fazlool Kareem, Tikka Garden Employee | 1/15/15 |
| 21 | Letter | Hasina Murshida, Brother's Mother-in-Law | 1/14/15 |
| 22 | Letter | Helal Yousuf, H2O Lounge Manager, Spouse of  Zaren Atique | 1/10/15 |
| 23 | Letter | Humayun Kabir, Brother-in-Law | 11/22/14 |
| 24 | Letter | Imran K. Bulu, Friend, Owner of Kawran Bazar Supermarket | 12/22/14 |
| 25 | Letter | Imrul Ahsan Habib ("Kochi"), Friend, Owner of Rasana Restaurant | 11/23/14 |
| 26 | Letter | ███, Nephew | 12/21/14 |
| 27 | | *Intentionally Left Blank* | |
| 28 | Letter | J.S. Sonia Khanam, Friend | 12/15/14 |
| 29 | Letter | The Jamaica Youth Club | 1/15/15 |

| 30 | Letter | The Jamaica Youth Club Jamaica Power Team | 1/20/15 |
|---|---|---|---|
| 31 | Letter | Jarin Azad, Wife | 2/10/15 |
| 32 | Letter | ███ Zaman, Sister | 1/20/14 |
| 33 | Letter | Jesmin Bhuyan, Friend | 1/30/15 |
| 34 | Letter | Kanez Fatima, Friend | 11/19/14 |
| 35 | Letter | Kanta Hossain, Friend | 11/22/14 |
| 36 | Letter | Kazi Alom, Friend | 1/5/15 |
| 37 | Letter | Kohinoor Begum, Friend, Spouse of Azmol Haque Chowdhury | 1/20/15 |
| 38 | Letter | Lutfa Nahar, Tikka Garden Employee | 1/10/15 |
| 39 | Letter | Md. Abu S. Chowdhury, Friend | 12/11/14 |
| 40 | Letter | Md. F. Ghani, Friend | 1/20/15 |
| 41 | Letter | Md. Hasan Uz Zaman, Friend | 12/17/14 |
| 42 | Letter | Md. Islam, Friend | 2/11/15 |
| 43 | Letter | Md. Jahangir Alam, Brother-in-Law | 12/15/14 |
| 44 | Letter | Md. Junaid Islam, Friend | 12/12/14 |
| 45 | Letter | Md. Mamun Ali, Friend | 1/19/15 |
| 46 | Letter | Md. Solaiman Kabir, Former Tikka Garden Employee | 11/15/14 |
| 47 | Letter | Md. Zillul Islam, Brother's Father-in-Law | 1/7/15 |
| 48 | Letter | Mahabub Rahman Munna, Friend, Owner of Sylhet Motors Car Dealership | 12/2/14 |
| 49 | Letter | Mahbubul Bari, Friend | 1/25/15 |
| 50 | Letter | ███ Zaman, Daughter | n/a |
| 51 | Letter | ███ Zaman, Daughter | n/a |
| 52 | Letter | Marin Azad, Sister-in-Law | 2/10/15 |
| 53 | Letter | Michael Yelinsky, Friend, Food Distributor | 12/22/14 |
| 54 | Letter | Mizanur Rahman, Friend | 1/12/15 |

| 55 | Letter | Mohammad Emdad, Wife's Brother-in-Law | 2/11/15 |
|----|--------|----------------------------------------|---------|
| 56 | Letter | Mohammad Hoque, Friend | 1/21/15 |
| 57 | Letter | Mohammad Idris, Tikka Garden Food Supplier | 1/22/15 |
| 58 | Letter | Mohammed Islam, Friend | 1/11/15 |
| 59 | Letter | Mohammed Khaleek, Tikka Garden Chef | 1/15/15 |
| 60 | Letter | Monir Zaman, Brother | 2/11/15 |
| 61 | Letter | Nabila Sadia Tabassum, Friend, Spouse of Reyad Adnan | 11/22/14 |
| 62 | Letter | Nazim Uddin Shahadi, Friend | 1/12/15 |
| 63 | Letter | Neehad Tawhid Islam, Brother's Brother-in-Law | 11/16/14 |
| 64 | Letter | Nurul Kabir Sham, Friend, Car Repair Center Owner | 12/20/14 |
| 65 | Letter | Pujarati Rajbansi, Friend | 1/14/15 |
| 66 | Letter | ██████ Jahangir, Nephew | 12/5/14 |
| 67 | Letter | Reyad Adnan, Friend, Spouse of Nabila Sadia Tabassum | 11/21/14 |
| 68 | Letter | Saida Akter, Friend, Spouse of Wahid Uz Zaman | 2/10/15 |
| 69 | Letter | Saidul Haque, Friend | 11/21/14 |
| 70 | Letter | Saiful Haque, Friend | 1/15/15 |
| 71 | Letter | ██████ Hossain, Friend, Son of Kanta Hossain | 11/28/14 |
| 72 | Letter | Saleh N. Haque ("Collins"), Friend, Spouse of Shampa Sharmin | 1/18/15 |
| 73 | Letter | Saleha Akter, Friend | 12/11/14 |
| 74 | Letter | Salina Akhter, Tikka Garden Employee | 12/2/14 |
| 75 | Letter | Samim A. Monir, Tikka Garden Food Supplier | 12/28/14 |

| 76 | Letter | Sanaul Haque, Friend | 1/24/15 |
|---|---|---|---|
| 77 | Letter | Sarmin Akter Shela, Friend | 11/22/14 |
| 78 | Letter | Saudia B. Ali, Former Sister-in-Law | 11/17/14 |
| 79 | Letter | Serajum M. Meah, Tikka Garden Food Supplier | 1/28/15 |
| 80 | Letter | ███ Hossain, Friend | 1/19/14 |
| 81 | Letter | Shahin Azad, Sister-in-Law | 11/20/14 |
| 82 | Letter | Shaira Begum, Mother-in-Law | 11/30/14 |
| 83 | Letter | Shampa Sharmin, Friend, Spouse of Saleh N. Haque | 12/22/14 |
| 84 | Letter | Sharif Asaduz Zaman, Father | n/a |
| 85 | Letter | Sharmin Ahmed Minni, Friend | 12/12/14 |
| 86 | Letter | Sharmin Bari Elin, Friend | 1/25/15 |
| 87 | Letter | Shibli Islam, Friend, Owner of Star Kebab Restaurant and Party Hall | 12/28/14 |
| 88 | Letter | Sultana Rabeya, Tikka Garden Employee | 12/14/14 |
| 89 | Letter | Sumaia Islam, Sister-in-Law | 1/12/15 |
| 90 | Letter | Suraya Begum, Tikka Garden Employee | 1/6/15 |
| 91 | Letter | Syed Hossain, Friend | 12/20/14 |
| 92 | Letter | ███ Emdad, Niece | 1/26/15 |
| 93 | Letter | Tasnia Emdad ███, Niece | 1/20/15 |
| 94 | Letter | Tohin Azad, Sister-in-Law | 11/16/14 |
| 95 | Letter | Vida Seetram, Former Sister-in-Law's Stepmother | 11/23/14 |
| 96 | Letter | Waheed Uz Zaman, Friend, Business Owner, Spouse of Saida Akter | 1/4/15 |
| 97 | Letter | Zafreen Zaman, Sister | 1/26/15 |
| 98 | Letter | Zaren Atique, Friend, Spouse of Helal B. Yousuf | 1/10/15 |

7

## I.      The History and Characteristics of the Offender

### A.      Mr. Zaman's Early Childhood and Family

Mr. Zaman was born in 1972 in Dhaka, the capital of Bangladesh, and

grew up in a middle class environment. He

was given the *dhaknam* or nickname

"Roman," which his father shortened to

"Rumi." His mother, Monowara Begum,

passed away from an unknown illness when

he was only three years old, leaving him



Mr. Zaman and his brother Monir

behind with his older sister Zafreen and his seven-week-old brother Monir.

Ex. 97: Zafreen Zaman Letter; Ex. 60: Monir Zaman Letter ("As I grew older

I recall my brother, Faisal and sister Zafreen being my main caretakers");

PSR ¶¶ 77, 78.

After Mr. Zaman's mother died, her family had no interest in

maintaining ties with him and has remained estranged from his family. Mr.

Zaman's father, Sharif Asaduz Zaman ("S.A. Zaman"), is now 74 and retired.

PSR ¶ 77. During Mr. Zaman's childhood, S.A. Zaman worked long hours as

a diplomat for the Bangladesh Ministry of Finance. He was frequently absent

when the children were growing up. As the oldest son, Mr. Zaman, "had to

assume the responsibilities as an adult/guardian for his younger brother,

8

Monir[,] and older sister, Zafreen[,] due to his father being away at work."

Ex. 31: Jarin Azad Letter. Monir recalls that his brother played a parental

role, responsible for tasks like "hand washing and ironing our cloth[e]s." Ex.

60: Monir Zaman Letter.

Although S.A. Zaman married again in 1978, he divorced ten years

later. PSR ¶ 81. Zafreen describes the divorce as the time when "our

stepmom was taken away; by her abandoning us. This setback and denial

created a hole in our mind that we were not good enough to make her stay."

Ex. 97: Zafreen Zaman Letter; *see also* Ex. 60: Monir Zaman Letter ("[M]y

step-mother that we accepted over time and called mom abandoned us…").

Although S.A. Zaman lives in Bangaldesh, he has flown to New York

on multiple occasions to visit his son despite his health problems, which

include high blood pressure, diabetes, and a history of strokes. Ex. 84: Sharif

Asaduz Zaman Letter ("I had visited [my son] in 1997, 1998, 2001,

2006[…]."); PSR ¶ 77. S.A. Zaman remarried once again, but his third wife,

Sabara Saburun, left S.A. Zaman immediately after the trial in this case due

to S.A. Zaman's health problems. In the past year, S.A. Zaman's health has

declined. Ex. 97: Zafreen Zaman Letter (S.A. Zaman has become

"bedridden," "cr[ies] aloud Faisal's name," and no longer receives daily

phone calls from Mr. Zaman).

Mr. Zaman's older sister, Zafreen Alam, lives in Dhaka as a homemaker with her husband and two children. Zafreen and Mr. Zaman have always been close. When Zafreen was planning her wedding more than 20 years ago, Mr. Zaman "helped day and night for the wedding to be perfect." Ex. 60: Monir Zaman Letter. Although Mr. Zaman has not met Zafreen's children in person, he has treated them from afar as close family. On their birthdays, Mr. Zaman sends them gifts and uses Skype and Facetime to talk in real-time. Ex. 66: ████ Jahangir Letter; Ex. 26: Imtiaz Jahangir Letter.

When Zafreen's youngest son, ████, was traveling with his family through a rural village in India as a child, he fell ill with meningitis. His family could not afford to pay to get ████ to a treatment facility. From the United States, Mr. Zaman spent hours trying to figure out who to pay to get ████ to safety. Mr. Zaman eventually found the right person, wired the necessary funds, and ████ was airlifted out of the area to a facility where he was successfully treated. Ex. 66: ████ Jahangir Letter; Ex. 43: Md. Jahangir Alam Letter. When Zafreen's husband, Md. Jahangir Alam, was in the hospital for three days for neck surgery, Mr. Zaman "stayed in touch with [him] for the whole entire time[,] taking leave from his work and daily duties." Ex. 43: Md. Jahangir Alam Letter.

Mr. Zaman's younger brother, Monir Zaman, came to the United States in 1994, a year after Mr. Zaman; Monir is married, has children of his own, shares a home with Mr. Zaman's family in Hollis, Queens, and has supported Mr. Zaman without fail throughout his case. PSR ¶ 78.

Mr. Zaman's third sibling, a younger adopted sister named █████, is eleven years old and living in Dhaka with S.A. Zaman and, until recently, his wife. PSR ¶ 78. █████ was born in a poor village in Bangladesh. When she was just a baby, she suffered burns after she was caught in a fire. Her parents abandoned her and no one in the community was willing to take her in. S.A. Zaman was in the village, offered to take the baby, and ultimately adopted her through the courts. Ex. 60: Monir Zaman Letter. Although Mr. Zaman has never met █████ in person, he offered to open his home here in New York to █████, his father, and stepmother, even though until the summer of 2014, Mr. Zaman was one of "six people living in a two bedroom apartment[.]" *Id.*; *see also* Ex. 32: █████ Zaman Letter ("I have never seen my brother Faisal but I love him a lot. He is so good to me. He always tells me jokes on the phone and funny things and always sends me toys and clothes…My dad tells me I can't talk to my brother I don't know why they don't tell me."). However, Monir's efforts to sponsor them to come to the

11

United States were unsuccessful. ███ remains in Dhaka with S.A. Zaman, who she must look after on her own.

Although Mr. Zaman has not met ███, he communicates with her by phone and over the computer. Such easy real-time communication has also enabled Mr. Zaman to develop a closer bond with Zafreen, whom he has not seen since immigrating to the United States. Ex. 97: Zafreen Zaman Letter. Zafreen writes that she "remember[s] going to school every day and holding my brother Faisal's hand for our ten minute walk to school. I would never let go of his hand;" since learning of Mr. Zaman's conviction, while Mr. Zaman's sentencing remains pending, Zafreen "wonder[s] when I will [] ever hold his hand again." *Id*.

### B.    Mr. Zaman's Immigration to the United States

Before his teens, Mr. Zaman spent six years with his family in Nairobi, Kenya, where his father had been assigned for work. PSR ¶ 81. The family subsequently returned to Dhaka in 1984 until 1992 when, at the age of 19, Mr. Zaman and his family once again relocated, this time to Rome, Italy. *Id*.[1] Three years later, Mr. Zaman left Rome and arrived at John F. Kennedy Airport in June 1993 on a visitor's visa with "dreams of making a better life

---

[1] The PSR incorrectly states that Mr. Zaman moved to Rome in 1990. Our failure to object to this inaccuracy was an oversight.

for himself and his brother, Monir." Ex. 40: Md. F. Ghani Letter; PSR ¶ 82.

Mr. Zaman was not fond of his dhaknam "Roman" and immediately started

asking people to call him Faisal. Approximately eight months later, Mr.

Zaman moved to Florida, where he stayed for less than a year before

returning to New York. PSR ¶ 86. Mr. Zaman spent three years moving

between various rooms-for-rent while working as a baker at Dunkin' Donuts,

first in Farmingdale from 1994 to 1996 and then in Port Washington from

1996 to 1997. He then permanently took up residence in Jamaica, Queens,

and obtained a license to drive a New York City taxicab. PSR ¶¶ 97-99.

### C.    Making a Living in a New Country

Monir believes S.A. Zaman "instilled in [his children] a very dedicated

work ethic" that Mr. Zaman still possesses. Ex. 60: Monir Zaman Letter.

When he arrived in this country, Mr. Zaman did not want assistance from his

father; he wanted to succeed on his own.

When Monir arrived in the United States from Rome, the two brothers

moved in together and have supported each other since. After settling into

Jamaica, Monir opened a retail store, 1 Hour Photo and Video. In 2002, after

five years of driving a taxi in New York, Mr. Zaman shifted his focus to

assisting Monir's business. PSR ¶ 96.

Mr. Zaman continued to support Monir's business ventures as Monir closed down the video store and opened a cell phone store called Actel Wireless, which he still owns and operates. PSR ¶ 95. In 2008, Mr. Zaman decided to open his own business. PSR ¶ 94. He conceived of Tikka Garden himself, located space on Hillside Avenue, and financed extensive renovations from his own savings and support from his father. Ex. 6: Trial Transcript at 1468-1469. He also received financial support from two Bengali acquaintances: Faziey Lohani, known as "Kauser," and Aminul Haque, known as "Mithu." Mr. Zaman, Kauser, and Mithu invested in the neighborhood of $120,000 each in the renovations and other startup costs. *See id.* S.A. Zaman testified at trial that he gave Mr. Zaman $120,000 for the restaurant, but opposed his taking on additional partners. *Id.*; *see also* Ex. 60: Monir Zaman Letter. Mr. Zaman opened Tikka Garden with his partners in January 2010. PSR ¶ 94; Ex. 91: Syed Hossain Letter (describing Tikka Garden as a "family style" restaurant). On February 22, 2010, the three partners entered into a written partnership agreement. Mr. Zaman spent most of his waking hours at Tikka Garden, working on average twelve hours per day, seven days per week, nearly every week of the year. Kazi Alom, a friend of Mr. Zaman's for nine years, has seen Mr. Zaman

> working from ten in the morning until way past
> midnight. I have seen him deal with customers,

14

> deliveries, take inventory, take orders, deal with the
> cash registers, serve food, and do whatever was
> needed for the business. Even though he was
> bombarded with work duties, he still found some time
> to spend with his family during the day, especially his
> twin daughters.

Ex. 36; *see also* Ex. 56: Mohammad Hoque Letter ("I had witnessed

[Mr. Zaman] helping his employees when the restaurant got very busy,

working side by side with his employees…"); *see also* Ex. 59: Mohammed

Khaleek Letter ("[Mr. Zaman's] daughters would always visit and have

dinner with their dad at the restaurant…After the incident I [the main chef]

haven't seen them anymore. I always thought they came to eat but actually it

was to come and meet their father they loved.").

Tikka Garden employs around 15 people, most of whom were unable

to find other work in the United States due to limited English skills and

education. *See* PSR ¶ 94. Suraya Begum, one of the employees from Tikka

Garden who testified at Mr. Zaman's trial, writes to the Court that she came

to the United States with "no prior work ethic, or paid working

experience…[and] didn't speak English very well." Ex. 90. Mr. Zaman hired

Ms. Begum and, for the first time in her life, she learned skills "that will

enable me to secure future employment if necessary." *Id.*; *see also* Ex. 38:

Lutfa Nahar Letter ("Faisal gave me a chance in life when others wouldn't.");

Ex. 88: Sultana Rabeya Letter ("I have a serious medical condition

concerning my back…This job is the only income for me and my daughter. Without [Mr. Zaman's] employment, I don't know how I would find a suitable job[.]").

Mr. Zaman does not hesitate to give back to his community through Tikka Garden. Not only does he let his employees eat at the restaurant for free, but he holds soup kitchen hours in his restaurant and donates food to the local mosque during Ramadan. Ex. 60: Monir Zaman Letter ("[Mr. Zaman] donates food to the local mosque for Iftar (meal breaking the fast during the month of Ramadan).").  A sales clerk at Tikka Garden, Lutfa Nahar, writes that "[t]he business is suffering without [Mr. Zaman's] guidance." Ex. 38.

In 2013, Mr. Zaman opened a second business, H2O Lounge. His manager, Helal Yousuf, worked closely with Mr. Zaman on the business since its inception; Mr. Yousuf explains in his letter that prior to working at H2O Lounge, he struggled to retain employment and was unable to provide for his family. Mr. Zaman hired Mr. Yousuf to be the manager of the new business. Ex. 22. Nearly 18 months later, Mr. Yousuf continues to manage H2O Lounge in Mr. Zaman's absence, making a living for himself and his family. *Id.*

Despite the success of Tikka Garden and H2O, the futures of both establishments are uncertain. Not only is the management struggling in Mr.

Zaman's absence, but Tikka Garden is now the object of a legal battle between Mr. Zaman's family, who wants to sell the restaurant to someone in a better position to maintain it, and Faziey Lohani, one of the shareholders and co-conspirators of the fraud scheme at issue. Mr. Lohani, who has already served his sentence for the fraud, filed a legal action to try to gain control of the restaurant after his release from prison. He has also appeared in Tikka Garden on more than one occasion with a large group of young men who were asked to leave and the police were called. An interim order is in place that permits Mr. Zaman's family to continue operating Tikka Garden but stops them from selling it. Mr. Zaman, his brother Monir, and his wife Jarin remain responsible for the rent under the lease. Eviction proceedings are underway.

### D.   Mr. Zaman's Family in the United States

Nearly twelve years ago, Mr. Zaman met his wife, Jarin Azad, through a mutual friend at a festival in Queens. PSR ¶ 84; Ex. 31: Jarin Azad Letter. According to Mrs. Azad, they soon "grew into a deep and beautiful relationship." *Id*. In Bangladesh, marriages are typically arranged by the parents. Monir's mother-in-law, Hasina Murshida, explains that in Bengali culture "we screen people before making them relatives" and that this "is the most crucial decision parents can make for their children." Ex. 21. "[L]ove

marriages are not appreciated." Ex. 89: Sumaia Islam Letter. Even though

Mr. Zaman and Mrs. Azad came together while living in the United States,

they felt their relationship was a violation of cultural and familial

expectations. *See* Ex. 31: Jarin Azad Letter. They kept their relationship a

secret from Mrs. Azad's parents until shortly before their wedding. *Id.*; *see*

*also* Ex. 52: Marin Azad Letter. After extensive discussions and efforts to

persuade their families that their American approach to love and marriage

could work, they eventually wed with their parents' blessings at the Queens

courthouse on April 26, 2006. PSR ¶ 83; Ex. 31: Jarin Azad Letter. Mrs.

Azad's mother, Shaira Begum writes, "[t]here isn't a happier memory for this

family." Ex. 82.

On February 7, 2008, Mr. Zaman

became a father when his twin

daughters, ████ and ████, were

born, a role with which Mr. Zaman was

already comfortable. PSR ¶ 83. Mr.



**Jarin and Faisal**

Kanez Fatima, a friend of Mr. Zaman's, explains in her letter to the Court:

> Faisal has a special relationship with his younger
> brother, Monir he takes care of him like a son; the two
> cannot function without each other. It is heartbreaking
> to watch Monir suffer without Faisal being around;
> the separation is agony for him. The two brothers

> have lived in the United States from a young age and
> only had each other to rely on.

Ex. 34; *see also* Ex. 22: Helal Yousuf Letter ("[Mr. Zaman] has a younger brother of his own, Monir, who[m] he has always taken care of and treasures; the fatherly/brotherly role is instilled in his heart and mind, this is the only way Faisal knows to be."). Mr. Saleh Haque, a friend of Mr. Zaman's since 1994, explains that "Faisal always had to make adult decisions at a very young age for both himself and his younger brother." Ex. 72: Letter. Monir has been struggling to cope with Mr. Zaman's incarceration. Ex. 39: Md. Abu S. Chowdhury Letter.

Before Mr. Zaman had children, he was a father-figure to many children in his community. ████ Hossain, a fifteen-year-old high school student, writes that when he was younger, Mr. Zaman used to babysit ████ and his brother, picking them up from school, cooking them dinner, and helping them with their homework; to ████, "Faisal is my uncle." Ex. 71. Mr. Zaman's former sister-in-law, Saudia, similarly states that, regarding her son ████, "Faisal would take care of him[,] pick him up, feed him, look after him, [and] keep him for practically the whole day while I was at work and attended school at night." Ex. 78. Due in large part to Mr. Zaman's help, Saudia graduated from the New York Career Institute with a degree in

paralegal studies, and now works as an executive assistant at The Hospital for Special Surgery. *Id.*

When ████ and ████ were born, they were nearly two months premature and weighed only 2.5 pounds each. PSR ¶ 83; Ex. 31: Jarin Azad Letter. Mrs. Azad was confined to the hospital for one week; the girls were hospitalized for six weeks. Ex. 31: Jarin Azad Letter. ████ and ████ suffered health complications. They were diagnosed with asthma and pneumonia almost immediately and continue to suffer from recurring health problems today. PSR ¶ 83. Mrs. Azad remembers that after their birth, Mr. Zaman "slept on the chair by my hospital bed until I was discharged, we couldn't stand being apart" and "visited my daughters everyday [*sic*]." Ex. 31: Jarin Azad Letter. The girls often miss school, particularly in the winter season, and one winter ████ spent a week in the hospital with pneumonia. *Id*.

Mrs. Azad observes that "[t]he attachment and bond between my daughters and their father is strong and unique." *Id*. Mr. Zaman has bragged to his friends "that his daughters just used to soak his face with kisses after school." Ex. 58: Mohammed Islam Letter. Mr. Zaman's 13 year old niece, ████ Emdad, writes that since Mr. Zaman has been incarcerated, "[m]y

20

cousins [████ and ████] always miss him and it is not fun like before to play with them." Ex. 92.

Shortly after the birth of ████ and ████, Mrs. Azad's mother, Mrs. Shaira Begum, started developing symptoms of Parkinson's disease. She was officially diagnosed in 2012 and her symptoms have gotten progressively worse. According to her daughter, Tohin Azad, Mrs. Begum "cannot lift her hands up very high. She is very weak." Ex. 94: Letter. Mrs. Begum's letter states that, while in some families "the grandmother often becomes a bother[,] [m]y son-in-law was the only one who made me important. … Faisal took care of me…[h]e used to come to my house everyday with rice pudding, the only thing my stomach could hold, and tell me about his day until he went back to work at the restaurant." Ex. 82: Shaira Begum Letter; Ex. 94: Tohin Azad Letter (Mr. Zaman "makes sure my mom [Mrs. Begum] is okay and has everything she needs.").

### E.    Mr. Zaman's Leadership in the Bengali Community of Jamaica, Queens

Mr. Zaman's restaurant, Tikka Garden, is the epicenter of the Bengali community in Jamaica, Queens. The neighborhood itself is an "area [where] most of the people are from Bangladesh." Ex. 14: Azmol Haque Chowdhury Letter. One of Mr. Zaman's food suppliers and friends of fifteen years, Serajum Meah, describes "Tikka Garden to be one of the best restaurants in

the neighborhood." Ex. 79. Mr. Zaman is known as a generous, caring, selfless person with good values. Even Mr. Imrul Habib, who owns a competing restaurant five doors away from Tikka Garden, says that Mr. Zaman "is a very close friend and we have done things together such as community outreach where we have provided food throughout the years from our restaurants for the needy, fundraisers for the victims of the hurricane and flood disasters that took place in Bangladesh, [and] at times we gave a helping hand to families that could not provide funeral costs to bury their loved ones." Ex. 25. During Hurricane Sandy, Mr. Zaman opened the doors of Tikka Garden, offering food, shelter, and support to his extended family and friends. He provided "blankets, pillows, food, water, and whatever else we needed. Faisal made sure Tikka Garden was well supplied in the event that power would be lost, roads would be closed and deliveries could not be made." Ex. 65: Pujarati Rajbansi Letter ("On that day though I was not the only one he provided for, there were also many others.").

Four of Tikka Garden's food suppliers have written to the Court in support of Mr. Zaman. Mr. Anjum Naved has been supplying vegetables and dried goods to Tikka Garden since the restaurant opened in 2010. Mr. Naved writes that:

> Faisal deals with many suppliers in the food and
> restaurant industry from vegetable, meat, sweets,

> dried goods, spices[,] and the suppliers are well
> connected. I have never heard anyone speak ill of him
> or about his character, honesty[,] payments or any
> other issues. Faisal manages and maintains a good
> rapport with each and every vendor that he deals
> with[.]

Ex. 12. Mr. Samim Monir, who supplies specialty beef products, has

observed Mr. Zaman's "pride and joy he has shown all these years" for Tikka

Garden and reports that "[s]ince [Mr. Zaman's] absence, the business is not

anything like it was[.]" Ex. 75; *see also* Ex. 87: Shibli N. Islam Letter

("Today this great eatery [Tikka Garden] is missing Faisal's supervision and

leadership, which has negatively affected the restaurant in these three months

of his absence.").

Mr. Zaman spends a lot of time helping others, be it responding to a

call from a friend with a flat tire in the middle of the night, Ex. 22: Helal

Yousuf Letter, running to the store in the evening to pick up milk for a

friend's child, Ex. 18: Farhana Wahab Letter, or taking care of funeral

arrangements for a family member grieving over the loss of a loved one, Ex.

78: Saudia Ali Letter. Mr. Zaman has always encouraged the younger

members of the community to stay in school and get an education. Ex. 67:

Reyad Adnan Letter ("At times I did contemplate dropping out of

college…Faisal did give me the most valuable advice  which was, he

reminded me what a privilege it is to be able to study in this country and how

23

my parents sent me here [from Bangladesh] to get a better education and secure my future."); Ex. 7: Abdul Mohsen Lodi Letter ("The most valuable piece of advice that Faisal gave me was to finish my studies[.]"); Ex. 91: Syed Hossain Letter ("Faisal would always talk to us as an elder brother and tell us to stay in school, continue our studies and get a career.").

In her letter to this Court, Mr. Zaman's friend Nabila Sadia Tabassum reflects, "Sometimes, I think how can one man carry so many responsibilities and still give you a big smile, chat with you for a while, ask you about your day, ask if you are hungry, and generally listen to you without passing any judgment; that's Faisal, he is that kind of person." Ex. 61.

Whenever a friend confides in Mr. Zaman that he or she is struggling with unemployment, Mr. Zaman goes out of his way to brainstorm, ask around the neighborhood for job opportunities, or sometimes even hire the individual in his own business. Ex. 41: Md. Hasan Zaman Letter ("I work for Uber Car Service. …[Faisal] suggested that I join Uber."); Ex. 22: Helal Yousuf Letter ("I was unemployed twice, let go from jobs that unfortunately downsized…Faisal offered me a managerial position in his new business[.]"). When Mr. Azmol Chowdury asked Mr. Zaman if he had any job openings at his restaurant, Mr. Zaman explained to Mr. Chowdhury that, at the age of 58, he was not right for the strenuous jobs Mr. Zaman had available. But Mr.

Zaman told Mr. Chowdhury to call him in two days; when he did, Mr. Zaman told him to get in touch with a friend, the owner of a local grocery store. Mr. Chowdhury "got hired and [it] was my first good paying job in New York." Ex. 14: Azmol Haque Chowdhury Letter; *see also* Ex. 37: Kohinoor Begum Letter ("[Mr. Zaman] helped us [] through this years with referrals and any advi[c]e he could give."). Mr. Alla Uddin, who is 23 years old and has been working at Actel Wireless for five years, credits Mr. Zaman with his experience at Actel Wireless that he calls a "life changing opportunity." Ex. 10: Alla Uddin Letter. According to Mr. Uddin, Mr. Zaman "not only taught me English, he personally trained me in computers, social skills, [and] sales." *Id.*

Many of the friends who submitted letters think of Mr. Zaman as kin. Sarmin Shela, a young woman who moved to the United States alone in 2009 at the age of 18, "had to leave my parents and siblings and come to a count[r]y where I did not know anybody," but "[s]oon I had an older brother, Faisal that I always could turn to for advice." Ex. 77: Sarmin Shela Letter. High school student ███ Hossain, whose mother is close friends with Mr. Zaman, explains in his letter that Mr. Zaman "always lets [███ and ███] know I am their brother." Ex. 71.

25

The letters suggest that Mr. Zaman encourages those around him. ███████ Hossain, who is currently a senior in high school, was skipping school and getting into trouble before Mr. Zaman took him under his wing and hired him as an apprentice at Tikka Garden; according to ███████, "[i]t was a sort of a rehab process to prevent me from having free time to do stupid things or be around negative influences…When I saw Faisal's behavior it helped me get my own life into perspective." Ex. 80: ███████ Hossain Letter.

In 2006, Mr. Zaman helped found The Jamaica Youth Club ("JYC"), a community cricket club that primarily attracts teenage youths of Bengali descent. *See* Ex. 29: JYC Letter; *see also* Ex. 60: Monir Zaman Letter. The JYC now has more than 50 members and has established two separate teams: JYC Super and JYC Power. Ex. 29: JYC Letter. Since JYC was founded, Mr. Zaman has helped collect donations for the team, has "provided assistance with uniforms, equipment, food for the team, and membership dues for the members who could not afford to pay[,]" and has hosted team meetings at Tikka Garden. Ex. 29, 30: JYC Letters; *see also* Ex. 60: Monir Zaman Letter (Mr. Zaman hosts "their annual gala at Tikka Garden"). The team helps keep local youths "off the streets, off of drugs, keeps our mind focused and disciplined, [and] teaches us to work as a team." Ex. 29: JYC Letter. One of

the original JYC members, Anwarul Haque Sujan, writes that "[i]t may seem like just a game but Cricket has taught me to be a team player, how to organize, execute, make decisions, and work under pressure in the real world." Ex. 13; *see also* Ex. 10: Alla Uddin Letter. The JYC Power team recognizes that Mr. Zaman's efforts have "changed paths for so many…for all these youngsters but also for the future generation to come." Ex. 30: JYC Power Letter.

During his years in the United States, Mr. Zaman has continued to support people suffering in his country, including flood victims and homeless children. Ex. 43: Md. Jahangir Alam Letter; Ex. 97: Zafreen Zaman Letter. In conjunction with fellow Bengali business owners in the area, Mr. Zaman voluntarily hosts an annual "Bengali Culture Show" at Tikka Garden designed "to support the ethnic culture in the community, the businesses and patrons." Ex. 25: Imrul Ahsan Habib Letter.

The 89 attached letters show that Mr. Zaman is an important asset to his community. *See generally* Exs. 7-14, 16-26, 28-98. Bengalis in Jamaica are well aware of the nature of Mr. Zaman's conviction through the publicity this case has received in the local newspapers and by word of mouth. Ex. 60: Monir Zaman Letter ("The Tragic News [*sic*] was all over the local newspaper and people were shocked and in disbelief."). People who have

27

come to Mr. Zaman's support have done so because he has revealed to them a character at odds with the dishonesty inherent in the crime for which he has been convicted. Ex. 8: Ahsan Habib Letter ("I know it sounds very ironic when I say he is honest given the nature of his conviction, but his honesty is like no other."); Ex. 81: Shahin Azad Letter ("[Mr. Zaman] is the type of person that you can depend on and trust with your eyes closed."); Ex. 33: Jesmin Bhuyan Letter ("I truly believe that this is totally out of character for him…"). Importantly, they do so without denying the crime or expressing distrust in the courts.

Mr. Zaman's support network extends beyond his immediate family to his friends, neighbors, employees, and fellow business owners. Mr. Zaman's "attachment to the community through all these years gives him a privilege to serve and know the members [more] closely than most people" and vice versa. Ex. 40: Md. F. Ghani Letter. Many living in Jamaica, Queens, have known Mr. Zaman for 15 or 20 years. Ex. 40: Md. F. Ghani Letter (Mr. Ghani, 51 years old, has "known Faisal since 1994[.]"); *see also* Ex. 73: Saleha Akter Letter. Although each writer articulates his or her own reaction to Mr. Zaman's incarceration separately, Mr. Kazi Alom sums up the community reaction succinctly: "all of our friends feel like a piece of our heart is missing[.]" Ex. 36.

### F.     The Consequences of Mr. Zaman's Conviction

When Mr. Zaman was incarcerated, he was separated from his daughters. He did not see them during the first two and a half months of his incarceration; he did not want them to see the jail or him in it. Mrs. Azad only told her daughters the truth about Mr. Zaman's whereabouts in early February; up until recently, "████ and ████ [kept] asking everyone the whereabouts of their dad and both girls write letters and draw him pictures daily, for when he returns. The children [thought] he [was] away on business." Ex. 21: Hasina Murshida Letter. Mr. Zaman's friend, Mr. Azmol Chowdhury, writes that "[w]hen I saw his two daughters my tears rolled down, I couldn't control my emotion. His daughters told me they miss their father." Ex. 14. Mrs. Azad tries to remain strong for the sake of her daughters, but she feels "alone in an empty house." Ex. 31: Jarin Azad Letter. Mr. Zaman's "clothes are still where he left [them] on the last day he was home, his shirt is still hanging on the doorknob in our bedroom. I don't want to move it, it makes me feel close to him and makes me think I will be seeing him soon." *Id.*

Since coming to this country 22 years ago, Mr. Zaman has never stopped working. He has always been employed and has helped his fellow community members find jobs in times of hardship. After gaining enough

experience, Mr. Zaman took a leap and opened up his own business, but he made a judgment error in the selection of his business partners. That error in judgment, however, should not diminish the life he built and the impact he has had on his community in Queens over the last two decades. Regardless of the outcome at sentencing, Mr. Zaman will be permanently split up from his wife and children after he is deported back to Bangladesh; Marin Azad, Mr. Zaman's sister-in-law, observes that Mrs. Azad cannot take her daughters to see Mr. Zaman in Bangladesh because of their health problems: "[m]y two nieces will suffer [be]cause the Bangladesh environment is not safe for them[.]" Ex. 52. Out of concern for Mr. Zaman, his family and friends have put all of their support into his sentencing proceeding because they are aware that "the rest of [Mr. Zaman's] life is in your hands." Ex. 18: Farhana Wahab Letter.

## II.    The Nature and Circumstances of the Offense

### A.    The Offense Conduct

At trial, Mr. Zaman was convicted on three counts: (1) conspiracy to commit bank fraud; (2) conspiracy to commit identification document fraud; and (3) use of a false passport. PSR ¶¶ 2-4. Mr. Zaman was arrested on November 21, 2013. He was released on bail until his conviction on November 12, 2014.

The evidence at trial showed that in the bank fraud scheme charged by the government from 2008 to 2011, a "job" worked as follows: individuals in the community would identify a "client" as a person who was not concerned about his credit or already had a false identity. The conspirators would use the client's name to incorporate sham corporations with no actual economic activity, sometimes using forged documents to prove the corporation's address or other information. The conspirators would open bank accounts in the name of the fictitious corporations. Members of the conspiracy "rolled" the bank accounts to make the accounts appear legitimate by making small deposits and withdrawals, again without any economic substance. As a result, after several months, the banks would make funds from deposited checks available for withdrawal before the checks cleared. The conspirators then executed what they called the "bust-out:" they deposited numerous large counterfeit checks into the accounts, typically on Thursdays and Fridays. Over the weekend, they withdrew similarly large sums from the accounts in either Atlantic City or Manhattan, after the funds had been made available but before the banks could discover that the checks were counterfeit. The bank accounts were then abandoned.

The cooperating witnesses at Mr. Zaman's trial arguably connected him to three specific jobs and one instance of mortgage fraud using a false

identity. This evidence is discussed in further detail in the argument section

below.

**B.     The Presentence Investigation Report and Sentencing Guidelines Calculation**

The final PSR calculates Mr. Zaman's total offense level at 35 with a

criminal history category of I, yielding an advisory Guideline range of 168-

210 months. PSR ¶ 106. However, the U.S. Department of Probation

recommends 120 months' incarceration on each count, to run concurrently.

PSR at 26 (Sentencing Recommendation). On January 22, 2015, the

defendant submitted objections to the original PSR. The government did not

submit objections to the PSR but submitted a response to the defendant's

objections on January 29, 2015 (hereinafter "Response").

In summary, the parties disagree on the loss amount attributable to Mr.

Zaman and his role in the offense. Mr. Zaman argued that he should receive

no more than 14 additional levels for a loss amount greater than $400,000;[2]

the government argued in response that it could prove a loss amount of

$6,601,737 and, by the date of the sentencing hearing set for February 27,

2015, expected to be able to prove a loss amount greater than $7 million, for

---

[2] Mr. Zaman has since revised that argument, and maintains that he should receive no more than 12 levels for a loss amount greater than $200,000 as discussed in argument § I.A *infra*.

a 20-level increase of Mr. Zaman's offense level. Defense counsel subsequently received a letter from the government dated February 12, 2015, with various bank records attached, stating in conclusory fashion that the government "now calculate[s] the intended loss as approximately $9,000,000 and actual loss as approximately $4,800,000."

Mr. Zaman further contests the increase of his offense level for his role in the offense. The government argued that Mr. Zaman was a leader or organizer of the fraud scheme and, consequently, a four-level increase for Mr. Zaman's aggravating role in the offense is appropriate. But the trial evidence revealed that Mr. Zaman was not a "leader or organizer" of the conspiracy. Rather, we submit, he had a minor role in the offense. Therefore, instead of a four-level increase, Mr. Zaman's offense level should be reduced by two levels. Probation has deferred to the Court for resolution of these issues. PSR at 24 (Addendum).

The defendant's calculation of the sentencing guidelines yields a total offense level of 23 and a sentencing range of 46 to 57 months; the government's calculation of the sentencing guidelines yields a sentencing range of 210 – 262 months (total offense level 37); Probation has recommended 120 months. The competing calculations are discussed in Argument § I, *infra*.

33

## ARGUMENT

The sentencing range of 17½ - to - 22 years sought by the government is patently absurd, almost 50 percent higher than the punishment recommended by Probation and more than 16 years higher than any of the sentences imposed on Mr. Zaman's co-defendants. As discussed below, the government has overstated both the loss amount attributable to Mr. Zaman and his role in the offense. We submit that the correct advisory Guidelines sentence is 46 to 57 months. *See* Argument § I, *infra*.

In addition, we respectfully request that the Court grant Mr. Zaman either a downward departure or a below-Guidelines sentence for reasons not reflected in the numerical calculation. First, if the government's loss figure is applied, it overstates Mr. Zaman's level of culpability and participation in the scheme. *See* Argument II.A, *infra*; U.S.S.G. § 2B1.1, Application Note 19(C) (downward departure where loss overstates seriousness of offense). Second, imposing a lengthy term of incarceration on Mr. Zaman would create an unwarranted sentencing disparity since the undisputed leader and intellectual author of the scheme, Aminul Haque, was sentenced to only 44 months; the next most culpable participant, Faziey Lohani, got 33 months; and the seven co-defendants sentenced so far in this case received sentences ranging from time-served to 15 months. Moreover, the kind of sentence sought by the

government and Probation is disproportionate with sentences imposed in fraud cases of this magnitude nationwide. Third, Mr. Zaman's history, characteristics, and current family circumstances warrant a sentence below the Guidelines to take into account his crucial role in the lives of his two small daughters and the countless people he has guided and helped over the years as reflected in the 89 letters attached hereto. Fourth, because of his immigration status, Mr. Zaman will face harsh conditions of confinement that amount to more severe punishment than is imposed on similarly situated, non-violent offenders.

## I.     The Guidelines Sentence without Departures is 46 to 57 Months in Prison [Level 23, CHC I]

In this section, we address the sentencing Guidelines calculation, beginning with a summary of the law governing Mr. Zaman's liability for the criminal actions of co-conspirators, and then analyzing the portion of the conspiracy's losses attributable to him, his role in the offense and the overall calculation.

### A.     The Relevant Conduct Inquiry under the United States Sentencing Guidelines

When calculating a defendant's total offense level under the United States Sentencing Guidelines, a court may consider all relevant conduct as defined by U.S.S.G. § 1B1.3.

Under the version of the Sentencing Guidelines currently in effect, in a case involving jointly undertaken criminal activity:

> In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision.  The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

Under U.S.S.G. § 1B1.3, Application Note 2, a court should begin by looking at "the scope of the criminal activity the particular defendant *agreed* to jointly undertake," that is, the "scope of the *specific* conduct and objectives embraced by the defendant's agreement." U.S.S.G. § 1B1.3, Application Note 2 (emphasis added). "[T]he scope of the criminal activity jointly undertaken by the defendant…is not necessarily the same as the scope of the entire conspiracy." *Id.*

Once the scope of the jointly undertaken criminal activity is determined, conduct of others within that scope is relevant if it is both  (1) in furtherance of the jointly undertaken criminal activity; and (2) reasonably

foreseeable in connection with that activity. *See* U.S.S.G. § 1B1.3(a)(1)(B).

Thus, the relevant conduct determination is a three-step inquiry.[3]

The "Illustrations of Conduct for Which the Defendant is

Accountable" under Application Note 2 illustrate that relevant conduct is

limited to the criminal activity that the defendant agreed to jointly undertake.

Illustration (c)(7), for example, describes the following:

> Defendant R recruits Defendant S to distribute 500
> grams of cocaine. Defendant S *knows that Defendant*
> *R is the prime figure in a conspiracy* involved in
> importing much larger quantities of cocaine. As long
> as Defendant S's *agreement and conduct* is limited to
> the distribution of the 500 grams, Defendant S is
> accountable only for that 500 gram amount…rather
> than the much larger quantity imported by Defendant
> R.

U.S.S.G. § 1B1.3, Application Note 2(c)(7) (emphasis added).

Similarly, illustration (c)(3) explains that Defendant J, who was hired by

Defendants H and I to help off-load a single shipment of marijuana, is "not

accountable for prior or subsequent shipments of marihuana imported by

---

[3] The first step of this test has engendered confusion, leading the United States Sentencing Commission this year to propose an amendment to U.S.S.G. § 1B1.3 clarifying that "the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, *even if those acts were known or reasonably foreseeable to the defendant*, are not relevant conduct under subsection (a)(1)(B)." Ex. 5: Proposed Amendments to the Sentencing Guidelines at 37 (emphasis added).

Defendants H or I because *those acts were not in furtherance of his jointly undertaken criminal activity* (the importation of the single shipment of marihuana)." U.S.S.G. § 1B1.3, Application Note 2(c)(3) (emphasis added). In that scenario, the scope of the criminal activity for purposes of the relevant conduct inquiry was the single shipment of marijuana, the activity the defendant *agreed* to. Future shipments are certainly foreseeable, but are not connected to Defendant J's jointly undertaken criminal activity or in furtherance of it. Defendant J agreed to undertake a discrete criminal act; the conspiracy's other shipments of marijuana fall outside of the scope of that agreement and therefore are not considered in calculating the amount of marijuana attributable to the defendant.

Accordingly, Mr. Zaman should be held liable for the conduct of others only to the extent that it was in furtherance of the conspiracy, reasonably foreseeable, *and* within the scope of the criminal conduct that Mr. Zaman *agreed* to jointly undertake.

### B. The Reasonably Foreseeable Intended Loss for the Criminal Activity Mr. Zaman Agreed to is Less than $400,000

Under U.S.S.G. § 2B1.1(b)(1) of the Sentencing Guidelines, the base offense level increases based on loss. The loss amount is the greater of the actual or intended loss. U.S.S.G. § 2B1.1, Application Note 3(A). The government bears the burden of proving the loss by a preponderance of the

evidence. *U.S. v. Killen*, 761 F.3d 945, 949 (8th Cir. 2014). The court must make a reasonable estimate of the loss based on available information. U.S.S.G. § 2B1.1, Application Note 3(C); *see U.S. v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (observing that "speculation is not permissible under the Guidelines" to determine loss amount).

In the PSR Guidelines calculation, the Department of Probation added 18 levels to Mr. Zaman's base offense level for intended losses greater than $2.5 million. This increase was based on the government's speculative loss amount calculation of $6,601,737. In a letter dated February 12, 2015, the government wrote to defense counsel that it calculates approximately $9,000,000 in intended loss and $4,800,000 in actual loss, which, if adopted by the Court, would increase the offense level by 20 levels. Although the government attached various bank records, the link to Mr. Zaman remains unclear. What is clear is that a speculative loss amount calculation is impermissible. *See id*.[4]

---

[4] The government calculates the $6.6 million figure by taking the total "bad check" amount on GX 1703, dividing it by 21 (the number of jobs on the exhibit) and multiplying it by 45, the midpoint between the 40 to 50 jobs that Shumon testified occurred. Response at 1-2. This figure is not a reasonable estimate but speculation. The government's explanation for $9 million in intended losses is even more mysterious. The government has served additional bank records and an updated chart on counsel, but has not

We respectfully submit that the Court should begin its loss inquiry by determining the scope of the criminal activity that Mr. Zaman agreed to jointly undertake. In this case, that activity consists of only the three or, at most, four discrete "jobs" that Mr. Zaman was allegedly connected to by the five cooperating witnesses who testified at trial and the thousands of pages of seized materials that corroborated portions of their accounts. Those jobs consist of the bank transactions related to the names Mosharaf Hossain, Amwal Hassam, Noor Hosson, and, arguably, Mr. Zaman's alleged unrelated mortgage fraud activity executed under the name of one of the accountholders in the scheme, Nasir Uddin. Mr. Zaman was not involved in and certainly did not agree to undertake other jobs organized by Mithu and Kauser; the bulk of the losses highlighted by the government, therefore, are not relevant conduct with respect to this specific offense characteristic for Mr. Zaman.

At trial, cooperating witness Syed Al-Hossain (known as "Shumon") testified regarding Mr. Zaman's involvement in the Mosharaf Hossain job. Except for the Nasir Uddin mortgage fraud, however, Shumon did not have knowledge of Mr. Zaman's involvement in any other jobs. Ex. 6: Trial

---

explained how the new, additional transactions are related to the fraud scheme in general or Mr. Zaman in particular.

Transcript at 276-277. Accordingly, the criminal activity that Mr. Zaman agreed to jointly undertake does not include, for example, the nine other jobs that Shumon executed *without* Mr. Zaman.

According to the government, the "bad check" amount from the three jobs that witnesses connected Mr. Zaman to was $747,600; the actual loss to the banks from these jobs was $464,717.93. *See* Ex. 4: GX 1703 (total of losses related to Amwal Hassam, Noor Hosson, and Mosharaf Hossain). At trial, the government presented GX 1703 into evidence, a chart titled "Bank Accounts Linked to Haque Residence, Storage Unit or Computer." *See id*. GX 1703 shows that since Mithu's arrest the government has uncovered evidence showing, in total, approximately $2.8 million in bad checks related to Mithu and his co-conspirators, with an actual loss amount of $1.6 million. As stated above, the "bad check" amount from the Hassam, Hosson, and Hossain jobs was $747,600 and the actual loss amount from the bust-outs was $464,717.93. Ex. 4. These jobs encompass the outer limit of the criminal activity that Mr. Zaman agreed to jointly undertake.

It is not possible to determine any loss amount associated with the Nasir Uddin mortgage fraud so, in the alternative, the Court should use the gain that resulted from the offense. U.S.S.G. § 2B1.1, Application Note 3(B). The gain consists of the $15,000 that, based on Shumon's testimony, Mr.

Zaman received from the fraud and split evenly with Mithu and Shumon. Ex.
6: Trial Transcript at 459-460, 465.

      While we concede that crediting all inferences in favor of the
government the Court could conclude that Mr. Zaman agreed to participate in
the Mosharaf Hossain and Noor Hosson jobs, we submit that the evidence
connecting Mr. Zaman to the Amwal Hassam job was insufficient to attribute
those losses to him. The only evidence connecting Mr. Zaman to the Amwal
Hassam job was Mr. Khalil's testimony that he overheard Mithu in Atlantic
City ask Mr. Zaman to put $20,000 in a hotel room safe during the Amwal
Hassam bust-out. However, Mr. Khalil did not see whether Mr. Zaman
actually did as Mithu requested. *Id.* at 677 (Mr. Khalil: Q: "Could you see
whether Mithu gave Faisal anything at that time? A: I didn't see anything that
Mithu hand over to Faisal. I didn't see that.").  There is no indication that Mr.
Zaman himself knew the source of the cash. Furthermore, Mithu admits in his
sentencing submission that he has a severe gambling problem. *U.S. v. Mithu*,
S1 11 Cr. 760, Dkt. No. 30: Sentencing Memorandum by Aminul Haque
Mithu.[5] If Mr. Zaman was even in Atlantic City that weekend, it was to see a
concert with his family and friends as his wife testified. Ex. 6: Trial

---

[5] Mithu's sentencing memorandum, which was filed publicly as part of his
appeal, is on file with this office and is available upon request.

Transcript at 1331-1332. He spent his time babysitting. *Id*. He was not

involved in any fraud activities that took place on that trip. *Id.*

   Accordingly, we submit that the total loss amount attributable to Mr.

Zaman for Guidelines purposes is as follows:

| Job | Intended Loss | Source |
|---|---|---|
| Nassir Uddin | $5,000 (gain) | Shumon Testimony |
| Mosharraf Hussein | $126,500 | GX 1703 |
| Amwal Hassam | $0 | Md. Khalil Testimony |
| Noor Hosson | $183,200 | GX 1703 |
| **Total** | **$314,700** | |

   However, even this figure overstates the intended loss because it

represents the total *potential* loss reasonably foreseeable to Mr. Zaman,

which is greater than the intended loss. "The fraud guideline [] has never

endorsed sentencing based on the worst-case scenario *potential* loss." *U.S. v.

Kopp*, 951 F.2d 521, 529 (3d Cir. 1991) (emphasis in original). When the

conspirators deposited the counterfeit checks, they did so knowing that they

would not successfully withdraw the full amounts of all those checks.

Although the bad check amount may be the largest potential amount of loss,

in this case, the intended loss must be somewhere below that figure. *See U.S.

v. Diallo*, 710 F.3d 147 (3d Cir. 2013) (remanding for resentencing where

district court used aggregate credit limit of counterfeit credit cards as the intended loss); *U.S. v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (remanding to permit district court to consider evidence that intended loss was less than face amount of loans). In any event, there is no evidence that puts the loss attributable to Mr. Zaman above $400,000 and so no more than 12 levels should be added under U.S.S.G. § 2B1.1(b).

### C.   Mr. Zaman Was Not an Organizer or Manager of the Fraud Scheme

The PSR upwardly adjusts Mr. Zaman's offense level by four levels for his alleged aggravating role as an organizer or leader of the scheme pursuant to U.S.S.G. § 3B1.1(a). However, the government bears the burden of establishing by a preponderance of the evidence an aggravating role increase; here, the government has failed to meet that burden. *See U.S. v. Holguin*, 436 F.3d 111, 119 (2d Cir. 2006).

To determine a defendant's role in the offense, the following factors should be considered:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, Application Note 4. The Background section of the commentary notes that an adjustment under this provision is "based upon the size of a criminal organization…and the degree to which the defendant was responsible for committing the offense. …it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate." *Id*.

In arguing for an adjustment under this Guideline, the government lays out in detail the various responsibilities of the leaders of the conspiracy in this case, such as seeking out clients; employing middlemen to interact with the clients; providing advance funds for middlemen, clients, and counterfeit identification documents; and directing the withdrawal of the funds. Response at 3-4. There is scant evidence that Mr. Zaman did any of this.

Shumon testified at length about the Mosharaf Hossain ("Mosharaf") job. According to Shumon, it was Shumon who first recruited the client through a middleman and passed the information on to Mithu. But the same middleman then approached Mr. Zaman about the same client. Mr. Zaman also agreed to take the client information and pass it on to Mithu. After some disagreement, Shumon and Mr. Zaman agreed to split the proceeds and collectively advanced some cash to the middleman, of which Mr. Zaman

45

allegedly paid $7500. Mr. Zaman's involvement then ended. But Shumon subsequently had multiple conversations with the middleman and with Mosharaf to discuss logistics and payment. Ex. 6: Trial Transcript at 354, 365. Shumon, Mithu, or Mohammed Khalil—Shumon was unsure— contacted Akm Golam Hossain to incorporate false companies under the client's identities. Ex. 6: Trial Transcript at 357. Either Shumon, Mithu, or Mr. Khalil (Shumon was again unsure) paid Mr. Golam to incorporate the companies. *Id.* at 358. Mr. Zaman was not involved.

The next step in the Mosharaf job was to open the bank accounts. Mr. Khalil usually accompanied Mosharaf to open bank accounts, though Shumon went on a few occasions. *Id.* at 361, 362. Mithu paid Mr. Khalil to accompany Mosharaf. *Id.* at 362. Mosharaf and Mr. Khalil then made deposits to "roll" the account from checks they received from Shumon or Mr. Khalil. *Id.* at 363. When the "bust-out" occurred, Mosharaf, Mr. Khalil, and possibly Shumon (whose memory was not clear on this fact at trial) deposited the counterfeit checks and, a day or two later, made the subsequent withdrawals in Atlantic City. *Id.* at 365, 369, 391. The counterfeit checks were made by Shohid Patoary, who gave the checks to Mithu. Mithu then passed them on to the individuals responsible for busting out the bank accounts. *Id.* at 369. After the bust-out, Mosharaf gave the cash he withdrew

to either Mr. Khalil or Mr. Patoary, who then gave the cash to Shumon. *Id.* at 392. Shumon later gave the cash to Mithu. *Id.* at 393, 394 (Shumon: "A: If Mithu was there, I would give it to him, or I would give it to him later."). Mithu would then divide and distribute the money. *Id.* at 275, 395. Mr. Zaman had no involvement in the bust-out as an organizer, manager, or otherwise.

Shumon was clear about Mr. Zaman's involvement: when asked if Mr. Zaman went to open bank accounts, he said, "No." *Id.* at 362. When asked if Mr. Zaman ever provided checks to roll the bank accounts, Shumon answered, "No, sir[,]" that was the responsibility of Shumon or Mr. Khalil. *Id.* at 364. Shumon denied receiving any counterfeit checks from Mr. Zaman for the bust-out and confirmed that Mr. Zaman never deposited a counterfeit check. *Id.* at 369-370. Mr. Zaman didn't talk to the client, Mosharaf, about the withdrawals during or after the bust-out. *Id.* at 378 (Shumon: "Q: Did you talk to [Mosharaf] at all about the withdrawals? A: [Mr. Khalil] did, and Shohid did. I think I did too. I don't remember exactly what I said to him. Q: But [Mr. Zaman] didn't, right? A: No.").

The government offered no evidence that Mr. Zaman recruited the client, obtained counterfeit checks, directed any part of the bust-out, or made any significant investment in the job as the government alleges the leaders

did. Mr. Zaman did not make decisions, participate in the bust-out, or meaningfully work on the scheme in any way. He was a passive player. The account bust-out would have proceeded as planned even without his participation. Mr. Zaman's involvement reduced the initial financial advance made by Shumon and nothing more.[6]

In its Response, the government supports its argument that Mr. Zaman was a leader with Shumon's testimony that Mr. Zaman "sent one of the conspirators to the New York Department of Motor Vehicles to obtain identification in a false identity for use in the bank fraud conspiracy." Response at 3. The conspirator was going to obtain the identity using a passport with a fake visa inside. Ex. 6: Trial Transcript at 456 (Shumon: "Without Faisal's OK, Shohid would never make the visa on the passport."). At trial, Shumon claimed that Mr. Zaman personally admitted this to Shumon over the phone. *Id.* at 431. But this testimony was not reliable: Shumon acknowledged on the witness stand that he had previously told the government in a proffer session that Mr. Zaman *denied* his involvement in

---

[6] The government advised Probation that Shumon testified that he, Mr. Zaman, and Mithu "directed Mohammed Khalil [to] withdraw funds from the counterfeit checks from the Sagor Seafood account." Response at 3. But we were unable to find any testimony by Shumon that Mr. Khalil was directed to withdraw funds for that account, and object to the government's assertion as a misstatement of the trial testimony.

the DMV incident. *Id.* at 432 (Shumon: "Q: But now you are changing your story, right? A: Right, sir."). Furthermore, Shohid Patoary testified that he was the only person in Mithu's scheme making false or counterfeit documents such as visas, and he only ever made them for Mithu. *Id.* at 190-191 (Shumon: "Q: …These U.S. visas that you used, were those real U.S. visas? A: No. Q: How did you get them? A: Like I said, one person in our crew that makes really good with the computers, he would make all of this stuff that we need."), 214, 239, 888, 899.

Shumon worked with Mithu from "2007, 2008" until after Mithu's arrest in 2011, i.e. for the full duration of the conspiracy charged by the government. *Id.* at 182. Shumon testified that, during that time, he completed approximately eight to ten jobs for Mithu. *Id.* Yet he was only aware of Mr. Zaman's involvement with one job, that is, the Mosharaf Hossain job. *Id.*

Finally, with respect to the Noor Hosson account, cooperating witness Golam Sarker (also known as Dipok Rana) testified that he was told by others that Mr. Zaman was the boss. *Id.* at 1216. Mr. Patoary also testified that Mr. Zaman encouraged him to execute the Noor Hosson bust-out, providing Mr. Patoary with money and check information. *Id.* at 938. However, Shumon testified that when Mithu was arrested, Mr. Patoary took over as the boss of the scheme. *Id.* at 437 (Shumon: "Q: After [Mithu] was

49

arrested, who became the boss, if anyone? A: Shohid. … [W]hen Mithu got arrested Shohid took his place as far as doing our job for us. We would just give it to him, he would open accounts, everything else."). After Mr. Patoary took over the scheme, Shumon gave Mr. Patoary the client information and they would split the profits from the jobs they busted out together. *Id.* at 457-458.

Although Mr. Patoary claims he got the checks for the Noor Hosson account through Mr. Zaman, he received permission to execute the job from Mithu, contradicting his own statements that the Noor Hosson job belonged to Mr. Zaman. *Id.* at 929-930 (Mr. Patoary: "A: I said Mithu Faisal gave me some job to do, and Mithu said, No problem, you can do it."), 936 . The trial testimony made clear that Mr. Zaman did not have any authority as a leader or manager of that job, or, for that matter, any other job. *Id.* at 900 (Mr. Patoary: "Q: So you only – up until Mithu's arrest you only made checks for Mithu, is that right? A: That's true, sir."), 929-930, 936 (Mr. Patoary: "Q: Did you work with Mithu on the [Noor Hosson] bust-out? A: No, sir. Q: Why not? A: Mithu got arrested."). Mr. Patoary was in charge of the Noor Hosson job; he would "make the check, deposit the bank account, and go to Atlantic City and withdraw the money." *Id.* at 938. Mr. Zaman did none of those things.

Although Mr. Patoary claimed Mr. Zaman stepped in as a leader after Mithu's arrest, the trial evidence does not connect Mr. Zaman to any other jobs executed after the arrest. In contrast, Mr. Patoary admitting doing other jobs *in addition to* the Noor Hosson account, with Shumon and other individuals involved in the scheme, suggesting that Mr. Patoary assumed a "leader or management" role whereas Mr. Zaman, at most, made passing remarks regarding the timing of the Noor Hosson bust-out. *Id.* at 939-940.[7] Additionally, Mr. Sarker testified that "Alam and Kabir took on the responsibility after Shohid was arrested. …they automatically ran with [Mr. Zaman] … [but Mr. Zaman] is not willing." *Id.* at 1215-1218. Mr. Patoary executed the Noor Hosson bust-out, which involved coordinating all of the participants, including Mr. Sarker, Alam, Kabir, Nazrul, and Sohel, all of whom were involved in the bust-out and all of whom had been involved in bust-outs previously. *See id.* at 1211-1212.[8]

---

[7] Although Juned Khan testified that Mr. Zaman attempted to recruit Mr. Khan multiple times over the length of the conspiracy, often over the phone, these alleged calls are not reflected in Mr. Zaman's phone records, undermining Mr. Khan's credibility in this matter. Ex. 6: Trial Transcript at 583, 585 (Mr. Khan: "A lot of times we talked on the phone."), 588, 613; GX 1811; DX-FF (The number of the phone seized from Mr. Khan at his arrest "is not found in the 1,436 pages of phone records for the Zaman phone").

[8] Mr. Zaman disputes the government's response to ¶¶ 31-34 of the PSR and the assertion that "[t]here was overwhelming evidence at trial that the defendant orchestrated the Noor Hosson fraudulent activity." Response at 3-

The testimony presented at trial, as outlined above, undermines the government's theory that Mr. Zaman played an aggravating role in the offense. Mr. Zaman did not control anyone or coordinate the fraud; he did not participate in the execution of the scheme; he received very little profit; and his illegal behavior ended with the arrest of Mr. Patoary in 2011, nearly two and a half years before Mr. Zaman's own arrest for the same conspiracy. Therefore, there is no increase pursuant to U.S.S.G. § 3B1.1.[9]

### D.    Mr. Zaman Played a Minor Role in the Offense

Mr. Zaman's role in the fraud scheme not only warrants zero levels for "aggravating role," but warrants a two-level reduction for his "mitigating role" as a minor participant under U.S.S.G. § 3B1.2(b).  The defendant bears the burden of establishing his mitigating role by a preponderance of the evidence. *U.S. v. Garcia*, 920 F.2d 153, 156 (2d Cir. 1990). Section 3B1.2 of

---

4. Regarding Mrs. Azad's shopping trip to Bloomingdales, Mrs. Azad testified that she tried to pay for her own items but Mr. Patoary insisted on taking care of it. Ex. 6: Trial Transcript at 1344.

[9] It is worth noting that Mr. Zaman called as a witness the leader of the conspiracy, Aminul Haque, who was a government cooperating witness for many months and who was in the best position to describe Mr. Zaman's role. Mr. Haque however asserted his Fifth Amendment privilege and declined to testify. But at proffer sessions, Mr. Haque told the government only that Mr. Zaman "got money from jobs, got a couple of people to bust-out accounts." We submit that that corroborates our reading of the trial evidence that Mr. Zaman was not a leader of the conspiracy. The notes from the proffer sessions are on file with this office and are available upon request.

the sentencing guidelines "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, Application Note 3(A). A participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.2, Application Note 1; U.S.S.G. § 3B1.1, Application Note 1.

Taking into account all relevant conduct, a minimal participant is a defendant who is "plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." U.S.S.G. § 3B1.2, Application Note 4. A minor participant is someone "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, Application Note 5.

The inquiry into the defendant's role in the offense in relation to his fellow participants is highly fact-intensive. *U.S. v. Garcia*, 920 F.2d at 155. In *U.S. v. Garcia*, 920 F.2d 153 (2d Cir. 1990), the Second Circuit upheld the district court's refusal to adjust downward for the role played by a drug courier. As the Court explained, "[c]ouriers are indispensable to the smuggling and delivery of drugs and their proceeds. The culpability of a

53

defendant courier must depend necessarily on such factors as the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *U.S. v. Garcia*, 920 F.2d at 155.

Although the present case concerns a fraud scheme rather than a drug scheme, the court's analysis in *U.S. v. Garcia* is analogous. In a check-kiting fraud scheme like the one run by Mithu, there are many moving players and parts on which the scheme as a whole depends for success. As described in argument sections I.A and I.B. *supra*, Mr. Zaman was never one of those moving players or parts. Mr. Zaman remained on the periphery of the scheme and, as evidenced by Shumon's testimony regarding the Mosharaf Hossain account, he was entirely *dispensable* to the scheme. In contrast, Mithu, as the leader, was indispensable; Mr. Patoary, who forged checks, was indispensable; Mr. Golam, who was a notary and had the expertise to incorporate sham companies, was indispensable; the accountholders who opened the bank accounts and withdrew the proceeds were indispensable; and experienced participants like Shumon, who acted primarily as middlemen between Mithu and the accountholders but also advanced money, deposited

checks when necessary, and oversaw the operation from the ground level, were indispensable.

According to the government, the actual leader of the scheme, Mithu, admitted during his proffer sessions that he recruited individuals for the scheme and "used between 10 and 15 'clients'…[and] admitted that he would send [them] into banks to deposit the counterfeit checks that he provided and then have them withdraw the funds before the banks discovered that the checks were counterfeit." *See U.S. v. Mithu*, S1 11 Cr. 760, Dkt. No. 28: Sentencing Memorandum by USA at 3, 4.[10] Nonetheless, the government requested only a three-level enhancement for Mithu as a "manager and supervisor" rather than a four-level enhancement as a leader or organizer. *Id.* at 3.[11] Although Mr. Zaman was close to the leaders of the conspiracy as a partner in Tikka Garden, Mr. Zaman's culpability in this complex fraud scheme is significantly less than the culpability of the other participants. Therefore, a two-level decrease in Mr. Zaman's offense level is warranted under U.S.S.G. § 3B1.2.

---

[10] The redacted version of this document filed publicly is on file with this office and is available upon request.

[11] Moreover, the government's description of Mithu's PSR asserts that the other leaders are Patoary and Lohani. *U.S. v. Mithu*, S1 11 Cr. 760, Dkt. No. 28 at 3 ("As described in the PSR (see ¶¶ 19-20), which was not objected to by the defendant, 'Patoary, Lohani and MITHU recruited individuals to open bank accounts in the names of fictitious companies….'").

### E.      Mr. Zaman's Total Offense Level is 23

For purposes of the Guidelines calculation, Counts 1 and 2 are grouped because the offense level is determined largely on the basis of the total amount of loss. PSR ¶ 46. Count 3 represents a separate harm and forms its own group. PSR ¶ 47. Mr. Zaman's total offense level for Group I is 23:

| | |
|---|---|
| Base Offense Level USSG § 2B1.1(a)(1) (2002 ed.) | 7 |
| Loss > $200,000 USSG § 2B1.1(b)(1)(J) | 12 |
| More than Ten Victims § 2B1.1(b)(2)(A)(i) | 2 |
| Sophisticated Means § 2B1.1(b)(10)(C) | 2 |
| Unauthorized Access Device § 2B1.1(b)(11) | 2 |
| Role in the Offense § 3B1.2(b) | -2 |
| **Adjusted Offense Level (Group 1)** | **23** |

Mr. Zaman does not contest the PSR's calculation of 10 levels for his Group 2 adjusted offense level. Since Group 2 is more than ten levels below Group 1, it is disregarded pursuant to U.S.S.G. § 3D1.4(c). Accordingly, the total combined offense level is 23, the Criminal History Category is I, and the Guidelines sentence is 46 to 57 months.

## II.    If the Court Agrees with the Government's Loss Calculation, It Should Downwardly Depart Because that Loss Amount Substantially Overstates the Extent of Mr. Zaman's Conduct

Mr. Zaman maintains that his loss amount for purposes of Sentencing Guideline § 2B1.1 is less than $400,000 as discussed in argument § I.A *supra*; however, should the Court disagree and conclude that the loss amount

is higher, a downward departure is warranted. Under Application Note 19(C) to the economic crimes guideline, U.S.S.G. § 2B1.1, a downward departure may be warranted in a case "in which the offense level determined under this guideline substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1, Application Note 19(C). "Because the loss determination essentially dictates the severity of the sentence, it is this determination that will almost always be the subject of departure scrutiny." *U.S. v. Roen*, 279 F.Supp.2d 986, 990 (E.D. Wis. 2003). Departure is available "when the defendant plays a limited or inferior role in the scheme that bore little relationship to the amount of loss determined under the guideline." *Id.* at 991.

That is the case here. The government asserts that it can prove a loss amount in excess of $7 million for a 20-level increase in Mr. Zaman's offense level. However, this loss amount overstates the extent of Mr. Zaman's participation in the transactions as described by the cooperating witnesses at trial. At most, Mr. Zaman was tenuously linked to only three of the jobs as discussed in argument §§ I.A and I.B *supra*. Yet the loss amount guideline proposed by the government holds Mr. Zaman accountable for the loss of the entire scheme.

Mr. Zaman was not connected to any other jobs. None of the cooperating witnesses testified to personal knowledge of his involvement in

57

the other jobs. The astronomical loss amounts proposed by the government

are out of proportion with Mr. Zaman's actual conduct and his gain, if any

from the scheme. Since the loss amount substantially overstates the

seriousness of Mr. Zaman's involvement in the offense, a downward

departure or a non-Guideline sentence is warranted.

**III.    The Court Should Impose a Below-Guidelines Sentence Based on Mr. Zaman's Personal History and Characteristics and to Avoid Unwarranted Sentencing Disparities**

We respectfully request that the Court begin with a sentence that fairly

reflects his offense conduct – 46 months – and vary downward to reflect the

many factors discussed in detail in the attached materials, including the

sentences imposed on Mr. Zaman's co-defendants, sentences imposed in

similar fraud cases, Mr. Zaman's extraordinary history of helping people in

his community, Mr. Zaman's essential role in caring for ████ and ████,

and the disparate punishment Mr. Zaman will endure as an immigrant in the

Bureau of Prisons system.

**A.    A Sentence Near Those Imposed on Mr. Zaman's Co-Defendants in this Case Would Prevent Unwarranted Disparities**

Under the Sentencing Reform Act of 1984 and *U.S. v. Booker*, 543

U.S. 220 (2005), a sentencing court must impose a sentence that is "sufficient

but not greater than necessary" to achieve the purposes of sentencing set forth

in 18 U.S.C. § 3553(a)(2). While an accurate calculation under the United

States Sentencing Guidelines is one factor that the court must consider in

imposing a sentence, the Guidelines range is not presumptively reasonable.

*Nelson v. U.S.*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a

sentencing court to presume that a sentence within the applicable Guidelines

range is reasonable."); *see also, U.S. v. Fernandez*, 443 F.3d 19, 27 (2d Cir.

2006). Indeed, the court must also consider the other factors set forth in §

3553(a), including, but not limited to, the need to avoid unwarranted

sentencing disparities with other defendants. *See* 18 U.S.C. §§ 3553(a)(3),

3553(a)(6).

In this case, imposition of a term of incarceration that deviates from

the range of sentences imposed on Mr. Zaman's co-defendants would create

just such a disparity. Any sentence approaching the 120 months

recommended by Probation (much less the range of 210 - 262 months that the

government requests) would be at odds with how similar defendants in this

case and analogous cases have been sentenced. Of Mr. Zaman's 13 co-

defendants, four are fugitives; the remaining nine have pled guilty and seven

have been sentenced. The two individuals who have not yet been sentenced

cooperated against Mr. Zaman at trial. PSR ¶¶ 9-18. None Of Mr. Zaman's

co-defendants received more than 15 months' incarceration; the lowest

sentence was time served. *Id.*

      The undisputed leader of the scheme, Aminul Haque "Mithu,"

appeared before the Hon. Denise L. Cote on June 22, 2012 and received the

most severe sentence of the participants: a term of 44 months' incarceration,

three years of supervised release, and restitution in the amount of

$800,397.08. PSR ¶ 19. Mithu entered into a cooperation agreement with the

government and provided "useful information during his numerous proffer

sessions." *See U.S. v. Aminul Haque Mithu,*[12] S1 11 Cr. 760, Dkt. No. 28:

Gov't Sentencing Memo at 6.[13] However, Mithu violated the agreement by

repeatedly and materially lying to the government. *Id*. The government

therefore declined to file a motion under U.S.S.G. § 5K1.1. Although the

government was well aware of the full scope of the entire scheme at the time,

it argued that only approximately $800,000 of losses should be attributed to

---

[12] Aminul Haque's indictment erroneously lists his last name as "Mithu." However, Mithu is in fact his *dhaknam*, or nickname. We use the name "Mithu" throughout this Memorandum without prefix because it is a nickname.

[13] This document was initially filed under seal. However, an unsealed version was later filed in the Appendix to Mithu's appeal. A copy of the Appendix is on file with this office and is available upon request.

Mithu for sentencing purposes. *See U.S. v. Mithu*, S1 11 Cr. 760, Dkt. No. 33: Sentencing Transcript at 10-11.[14]

 Mr. Zaman's other business partner and Mithu's partner in the fraud scheme, Faziey Lohani, was sentenced by the Hon. Paul G. Gardephe on June 20, 2012. PSR ¶ 20. Trial testimony in this case revealed, at least as a general matter, that Mr. Lohani was a key leader in the conspiracy. *See* Ex. 6: Trial Transcript at 217, 280 (Shumon: "Q: What was [Bema's] role? A: He was with Kauser. He did a couple – he worked as a face for Kauser a couple of occasions."). Nonetheless, at Mr. Lohani's sentencing, the government— again well aware of the full scope of the fraud—stipulated to a loss amount of $195,146.74. The government wrote in its Sentencing Memorandum that, thus calculated, a Guideline sentence was warranted because, "[w]ith respect to the nature and circumstances of the offense, although the defendant is only being held responsible for a loss amount of $195,146.74, the bank fraud conspiracy was widespread and victimized numerous banks, resulting in over $10 million in losses." *U.S. v. Lohani*, 11 Cr. 535 (PGG), Dkt. No. 39 at 4. Judge Gardephe imposed a sentence of 33 months' incarceration, two years of supervised release, and restitution in the amount of $195,146.74.

---

[14] The version of this document also filed with Mr. Mithu's appeal is on file with this office and is available upon request.

There can be little dispute that Mr. Zaman was less culpable than Mr.

Lohani. Rather, the losses caused by Mr. Zaman are similar to those of the

co-defendants sentenced by this court, whose terms of incarceration ranged

up to 15 months. Under these circumstances, we request a sentence

comparable to the sentences imposed on Mr. Zaman's co-defendants in order

to reflect relative culpability and avoid a sentencing disparity that is precisely

the kind of "black stain on common sense" that Judge Block sought to avoid

by imposing a below-Guidelines sentence in *U.S. v. Parris*, 573 F.Supp.2d

744, 754 (E.D.N.Y. 2008) (sentencing defendants convicted of securities

fraud to 60 months in prison despite Guideline recommendation of 360

months to life based on, *inter alia*, enhancements for a loss over $2,500,000,

for use of sophisticated means, for leadership roles in criminal activity

involving more than five people, and for obstruction of justice based on false

testimony to the SEC).  And Judge Block is not alone: in 2013, avoiding

sentencing disparity was the second most common reason given by federal

judges who exercised their authority, conferred by the Supreme Court in *U.S.*

*v. Booker,* 543 U.S. 220 (2005), to sentence outside the Guidelines range.

United States Sentencing Commission 2013 Sourcebook of Federal

Sentencing Statistics (hereinafter, "USSC 2013 Sourcebook"), *Table 25A:*

*Reasons Given by Sentencing Courts for Downward Departures with*

Booker/*18 U.S.C. § 3553* ("Avoid unwarranted sentencing disparity among defendants" cited in 6.1 % of all downward departures).[15]

In 2013, the average loss in a federal fraud case was $5,293,655 and the median loss was $195,649 United States Sentencing Commission, *Overview of Federal Criminal Cases – Fiscal Year 2013*, 10 (August 2014) (hereinafter, "USSC 2013 Overview"), yet for criminal history category I offenders the average term of incarceration across federal fraud cases nationwide was 33 months and the median term of incarceration was 21 months. USSC 2013 Sourcebook, *Table 14: Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category*.

Even when the offender is central to a larger conspiracy causing much greater losses, courts routinely impose sentences in the range we seek here. As Judge Block observed in reviewing nationwide cases of securities fraud in order to determine an appropriate sentence for defendants who obtained nearly $5 million from a "pump and dump" scheme:

> [I]t was perfectly clear that there was a correlation between the losses in those cases and the periods of incarceration: Those who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms.

---

[15] The most recent data available is from 2013.

*U.S. v. Parris*, 573 F.Supp.2d 744, 753 (E.D.N.Y. 2008). Based primarily on data provided by the government, Judge Block included in his opinion a table of representative cases, showing sentences no greater than 108 months for an actual loss of $67 million. *See id.* at 753. There was no case on the table with a loss of less than $1 million. Sentences started at 366 days for a loss of $1.3 million. The median sentence imposed was for a loss of $12.6 million; the sentence there was 48 months. *Id*. Based on this data, Judge Block imposed a non-Guidelines sentence of 60 months even though the Guidelines yielded a sentence of 360 months to life. *Id*. at 745.

For these reasons, we respectfully submit that based on this data, sentencing Mr. Zaman to a term of incarceration in line with the sentences imposed by this Court on his co-defendants would avoid unwarranted sentencing disparities. Therefore, a non-Guidelines sentence is warranted. 18 U.S.C. § 3553(a)(6).

### B. The Court Should Reduce Mr. Zaman's Sentence Because of the Extreme Hardship to His Family

A downward departure for exceptional family circumstances is permissible in the face of "especially compelling circumstances." *U.S. v. Selioutsky*, 409 F.3d 114, 119 (2d Cir. 2005). The Second Circuit found such circumstances in *U.S. v. Alba*, 933 F.2d 1117 (2d Cir. 1991), a case in which the defendant and his wife cared for their daughters and the defendant's

parents, one of whom was disabled. *See U.S. v. Johnson*, 964 F.2d 124, 129

(2d Cir. 1992). The Second Circuit "let stand the sentencing court's finding

that incarceration in accordance with the Guidelines might well result in the

destruction of an otherwise strong family unit[.]" *U.S. v. Johnson*, 964 F.2d at

129.

Under the circumstances here, there is no question that a lengthy

incarceration for Mr. Zaman will break his strong family unit that is unable to

support itself in his absence. As detailed in the Facts section above, Mr.

Zaman's life and home is here in Queens, New York. Mr. Zaman has been

living in the United States since 1993; his brother and best friend, Monir,

joined him in the United States in 1994; he met his wife here in 2003,

married in 2006, and fathered two twin girls in 2008; the Bengali community

in Jamaica has grown in the last 20 years, and Mr. Zaman is at the heart of

that community. *See* Ex. 76: Sanaul Haque Letter. Mr. Zaman has always

strived to assimilate while remaining true to his Bengali roots.

Mr. Zaman's focus has been providing for his family. He was the

primary source of income and support for his wife and children. Mr. Zaman

has worked hard since moving here and, starting in 2008, he built a

successful business from the ground up. Since his incarceration, Mr. Zaman

has been unable to provide his family with the support they need and the

future of Tikka Garden is in doubt due to the legal battle discussed above. Salina Akhter, an employee at Tikka Garden who works at the front counter, writes that Mahabubuz Zaman "has been the heart and soul of this establishment [Tikka Garden] providing for his own and so many other families." Ex. 74.

Monir Zaman is struggling to fill his brother's shoes while continuing to run his own business, Actel Wireless, and provide for his own wife and children. Monir's wife, Sumaia Islam, writes that since Mr. Zaman's incarceration, "Monir has to maintain two families and businesses at the same time; I never get to see him as before." Ex. 89. Monir and Sumaia recently had a son, who is now just over six months old, yet Sumaia feels that "our small family is on the verge of total disarray and is falling apart due to what is happening with Faisal." *Id.* Monir himself admits doubts: "I don't have the courage and ability to maintain both families and responsibilities; I can never replace [Mr. Zaman] as a father…and a husband. My life has changed so much I cannot even tend to my six month old son ███████ and my family because I have no time for myself, with all the problems our families are already facing…." Ex. 60.

Mr. Zaman's wife, Mrs. Azad, feels the physical and financial pressure of her husband's absence. *See* PSR ¶ 84 ("[D]uring a telephonic interview

[with the probation officer], Mrs. Azad…stated that she has since been depressed and upset about the situation. During periods of the interview, she appeared to be distraught and in tears. She described Zaman as a kind-hearted and loving person, and she hopes he will receive a second chance from the Court for the sake of his family."). Mrs. Azad no longer has a partner who can help her take the girls to school or the doctor or hospital when they are sick, or look after them when she is not able to. Ex. 60: Monir Zaman Letter. The girls are not their normal selves and they are struggling to focus in school. Ex. 52: Marin Azad Letter. Mrs. Azad recently started working as a teller at Chase bank, but her income is modest, and her employment is at risk due to the increased family demands imposed by Mr. Zaman's absence. She writes to the Court:

> I feel overwhelmed…as if all these responsibilities
> that I use to entrust to my husband are all pushed onto
> me and I can't handle it. I can't be a single mother.
> With my two children, I can't work a full-time job and
> take care of them at the same time. My daughters need
> their father to take care of them. I don't know how to
> take care of his businesses and a broken family.

Ex. 31: Jarin Azad Letter.

Additionally, Mr. Zaman's virtually certain deportation to Bangladesh assures his continued separation from his family. *Id.* ("If my husband gets deported, my sick daughters will never be able to see their father."). Mr.

Zaman does not want to return to Bangladesh. Mrs. Azad cannot take her daughters to Bangladesh; she took them to Bangladesh two years ago to visit family members, but they became "extremely sick with stomach and breathing issues ([a]sthma) because of the polluted environment." *Id.* Mrs. Azad's sister, Marin, explains that "[m]y two nieces will suffer because the Bangladesh environment is not safe for them[. T]hey have asthma. Also, Zaman lived in this country for twenty-two years; he never went back to Bangladesh. I[t] will be hard for him to start everything from scratch." Ex. 52: Marin Azad Letter. Mr. Zaman "will be a childless father and the girls will be fatherless children." Ex. 31: Jarin Azad Letter. On February 8, 2015, █████ and █████ turned seven years old. This was their first birthday without their father. When Monir asked them what they wanted for their birthday, they said, "We want our Papa." Ex. 60: Monir Zaman Letter.

Mahabubuz Zaman is 42 years old and has not been to Bangladesh for 25 years. Monir Zaman is afraid that his brother will not be able to start over in a country he has not seen since 1992 and that a long period of incarceration in this case would not only punish Mr. Zaman but cripple him in a way that he "cannot pick up and continue" afterward. *Id.*

For the reasons stated above, a downward departure or a non-Guideline sentence should be granted in this case so that Mr. Zaman can resume his role

as a productive member of society and support his family as best he can.

Moreover, a non-Guidelines sentence is warranted to reflect Mr. Zaman's

long history of positive contributions to the community before his

incarceration. *See* Facts § I.E, *supra*.

### C.     A Reduced Sentence is Warranted Because Mr. Zaman Faces Harsher Conditions of Confinement than Other Offenders Due to His Immigration Status

The Ninth Circuit has acknowledged that immigration status "could

lead a sentencing court to two opposite conclusions, one being that potential

deportation and fewer opportunities should be a reason for a downward

variance. Conversely, the other conclusion could be that a person granted the

benefit of entry to the country should be subject to an upward variance for

abusing the privilege. In different factual contexts, either approach is within

the discretion of the court." *U.S. v. Petrus*, 588 F.3d 347, 356 (6th Cir. 2009).

In this case, a downward variance is warranted.

As detailed in the attached affidavit from prison consultant Joel

Sickler, Mr. Zaman can expect to be imprisoned with dangerous, violent

felons despite the non-violent nature of his crime. Mr. Sickler is a

criminologist who has "worked in the field of sentencing and corrections for

over 30 years and currently head[s] the *Justice Advocacy Group L.L.C.*, a

consortium of criminal justice professionals based in Alexandria, Virginia."

69

Ex. 1: Affidavit of Joel Sickler ¶ 2. In his affidavit, Mr. Sickler describes the harsh conditions suffered by inmates such as Mr. Zaman by mere virtue of their immigration status. *Id.* In short, according to Mr. Sickler, "Mr. Zaman will be placed in a facility beyond his security needs solely because of his immigration status, which will place him at unnecessary and unwarranted risk." *Id.* ¶ 36.

Mr. Zaman is a non-violent offender with no criminal background. A similarly-situated inmate who is a citizen of this country would normally be placed in a minimum security camp that is relatively safe, populated with non-violent offenders. Due to Mr. Zaman's immigration status, however, the Bureau of Prisons ("BOP") will automatically classify Mr. Zaman as low-security and "therefore not eligible for minimum-security camp status as he otherwise would have been given the [non-violent] nature of his offense" and his lack of criminal history. *Id.* ¶ 4; *cf. U.S. v. Mohammed*, 501 Fed. Appx. 431, 447 (6th Cir. 2012) (affirming district court's declination to depart downward where defendant's "possession of a large amount of narcotics and possession of a firearm could independently render him ineligible for a minimum-security prison").

Instead, Mr. Zaman will be incarcerated in a low-security Federal Correctional Institution, most likely in a privately contracted facility

specifically designed for inmates awaiting deportation. Ex. 1 ¶¶ 4, 7. Mr.

Sickler observes that the differences between low-security facilities and

camps are stark, with substantially different levels of security, overcrowding,

safety, and visitation. *Id.* ¶ 5. Inmates at low-security facilities endure

random pat-downs, strip searches, and lock-downs. *Id.* ¶ 5.i. "Inmates are

subjected to controlled movements on the hour with only ten minutes to get

to one's next assigned designation." *Id.* ¶ 5.i. Camps typically house between

100 and 400 inmates; low-security facilities, in contrast, may be overcrowded

and house approximately 1200 to 1500 inmates. *Id.* ¶ 5.ii. Consequently,

"bacteria and viruses can be widespread…and diseases such as MRSA staph

infections routinely spread" in the communal bathroom facilities. *Id.* ¶ 5.ii.

The threat of violence is much higher at low-security facilities: many

inmates have been convicted of violent offenses or are gang-affiliated,

whereas the camps only hold inmates who "have *no history of violence*." *Id.* ¶

5.iii. (emphasis in original). Statistics show that "inmates at low-security

facilities are 431 percent more likely to be the victim of a 'serious assault'

than at a camp facility." *Id.* ¶ 5.iii.  Finally, social visits are much more

difficult for an inmate housed in a low-security or private facility. The

visitation environment can be crowded, stressful, and traumatic, negating

much of the value of a visit from family or friends. *Id.* ¶ 5.iv. Such a secure

facility is no environment for two young children with health problems like

███████ and ███████. *Id.* n. 4.

According to Mr. Sickler, holding Mr. Zaman at one of these privately

contracted BOP facilities is "tantamount to multiplying the severity of his

sentence." *Id.* ¶ 9. Studies show that the risk of assault in a private facility is

twice as likely as in a public facility. *Id.* ¶ 12. In his affidavit, Mr. Sickler

elaborates in depth about the violence at particular facilities and the reasons

for such difficult conditions. *See generally id.*

Mr. Zaman's immigration status also affects the date on which he will

actually be released from custody. Normally an inmate participates in "pre-

release re-entry transitioning" at a BOP Residential Re-Entry Center

(commonly known as a half-way house) near the end of his or her term of

incarceration to ease the transition back into the community. *Id.* ¶ 33. Mr.

Zaman, however, will not have the opportunity to participate in this program;

instead, after he has served his sentence, Mr. Zaman will become a

"detainee" in the custody of U.S. Immigration and Customs Enforcement

while waiting to be deported. *Id.* ¶¶ 26-33. The process of removing Mr.

Zaman to Bangladesh could easily take between six months and a year,

during which time he will remain in a county jail or Federal Detention Center. *Id.* ¶¶ 28-30.[16]

Mr. Zaman will likely serve his term of incarceration in close proximity to violent offenders in a dangerous and overcrowded facility, only to be detained at another facility once his formal term of incarceration is complete. The punitive effect of Mr. Zaman's incarceration will be compounded by these factors that Mr. Zaman will suffer only because of his immigration status. Therefore, this Court should grant Mr. Zaman a non-Guideline sentence to reflect the unnecessarily heightened punitive effect of his term of incarceration as a result of his immigration status.

---

[16] Mr. Sickler explains in his affidavit that many immigrants who await deportation in ICE custody after serving their sentence do so, in part, because the Homeland Security Department requires, as part of its funding package, that ICE keep at least 33,000 illegal immigrants in custody at all times. This provision, termed the "bed mandate," is discussed in more detail in attachment B to Mr. Sickler's affidavit and an accompanying article. *See* Exs. 1, 3.

## <u>CONCLUSION</u>

For the reasons set forth above, the defendant should be sentenced to a term of incarceration comparable to the range of sentences imposed on Mr. Zaman's co-defendants in this case.

Dated:      New York, New York
              February 20, 2015

Respectfully submitted,

Law Office of Zachary Margulis-Ohnuma

By:_____/s/_____
Zachary Margulis-Ohnuma
Sharlene Morris
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 685-0999